## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## CASE NO.  05-22970-CIV-HUCK/O'SULLIVAN

LORNE BATTISTE, *et al.*,

      Plaintiffs,

vs.

BROWARD SHERIFF ALFRED T.
LAMBERTI, *et al.*,

      Defendants.

_____/

### OMNIBUS ORDER ON MOTIONS FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on the following Motions:

1)      Broward Sheriff's Office ("the BSO") Defendants' Motion for Summary Judgment, filed June 18, 2008 (D.E. #143);

2)      Plaintiffs' Motion for Final Partial Summary Judgment Against Broward Sheriff's Office and BSO Defendants Gregory Goodwein, Mario Barcelo, Melvin Wilkin, Ron Reffett, and John Brooks, filed June 18, 2008 (D.E. #147); and

3)      The City of Miami's ("the City") Motion for Summary Judgment, filed June 18, 2008 (D.E. #138).

The Court has reviewed the Motions, the responses and replies thereto, and all other pertinent portions of the record, and is otherwise duly advised in the premises.

### BACKGROUND

Plaintiffs in this case are four union activists who protested at the Free Trade Area of the Americas ("FTAA") summit held in Miami, Florida.  The summit was held from November 18 through November 23, 2003 and represented the largest joint law enforcement effort in Florida's history.  The City and the Miami Police Department ("MPD") anticipated demonstrations and possibly violent protest on a large scale in connection with the summit.  To plan for this event the MPD recruited individuals from various police departments from south Florida to make up a multi-

agency security force of nearly forty different law enforcement agencies.  Some of these participating agencies, including the BSO, signed a "mutual aid agreement" with the City with allowed them to exercise police powers outside its own jurisdiction and within the City.  The City remained the lead agency organizing and directing security for the FTAA summit.  The MPD's Deputy Chief Frank Fernandez was the City's operations commander at the summit.

This case stems from the arrest of all four Plaintiffs in downtown Miami on November 20, 2003.  Plaintiffs were arrested on a set of railroad tracks in downtown Miami by BSO deputies as they made their way home after attending protest events connected with the summit.  Defendants Melvin Wilkin, Gregory Goodwein, and Mario Barcelo were the arresting deputies and members of an "arrest team" with the BSO Field Force ("the arresting deputies"), which was marching through downtown Miami to provide security to the event.  Defendant John Brooks was the BSO's on-site commanding officer at the summit, and was in charge of the two BSO Field Force units operating on November 20, 2003: the Delta and Echo units.  Each Field Force unit consisted of 50-60 officers, including line deputies, grenadiers (who carry "less than lethal" munitions such as tear gas), arrest teams, and supervising officers.  Defendant Ron Reffett reported directly to Brooks and was the leader of the Echo unit.  Defendant Anthony Pulitano was a member of the BSO S.W.A.T. team, and was present to provide back up to the BSO Field Force.

Plaintiffs were each charged with disorderly conduct in violation of Florida Statutes § 877.03.  The arrest affidavits for all four Plaintiffs stated: "Pursuant to mutual aid agreement subject was given dispersal order by Major Burden MPD after given the opportunity to disperse, subject became violent and had to be arrested."  All charges against Plaintiffs were ultimately dismissed.

Plaintiffs went through several iterations of their Complaint.  In the most recent, the Second Amended Complaint ("SAC"), Plaintiffs sued the City, the City's Chief of Police John Timoney, the Deputy Chief Fernandez, the Broward County Sheriff, and the following individual defendants with the BSO: Captain Brooks, Chief Reffett, and Deputies Goodwein, Barcelo, Wilkin, and Pulitano.[1]

---

[1] Some of these individuals are no longer defendants in this action.  The Court initially denied Timoney's Motion to Dismiss Counts XIV and XV against him, but was reversed on appeal - thus, Timoney is no longer a defendant.  *See* D.Es. #89, 122.  Also, the Court granted Fernandez's Motion to Dismiss Counts XVI and XVII against him - thus, Fernandez is no longer a defendant.  *See* D.E. #89.

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "material" if it is a legal element of the claim under applicable substantive law which might affect the outcome of the case. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *See Allen*, 121 F.3d at 646. On a motion for summary judgment, the Court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the non-moving party and determine whether that evidence could reasonably sustain a jury verdict. *Celotex,* 477 U.S. at 322-23; *Allen*, 121 F.3d at 646.

Further, while the burden on the movant is great, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 252. A mere "scintilla" of evidence in favor of the non-moving party, or evidence that is merely colorable or not significantly probative, is not enough. *Id.*; *see also Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (conclusory allegations and conjecture cannot be the basis for denying summary judgment).

## ANALYSIS

### A.   THE BSO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

#### 1.   Counts I-IV against Wilkin, Goodwein, and Barcelo

In Counts I-IV Plaintiffs seek to recover under 42 U.S.C. § 1983 from their respective arresting deputies. In those counts Plaintiffs claim that all three deputies violated their First, Fourth, and Fourteenth Amendment rights, essentially bringing false arrest and free speech claims under section 1983.[2] Specifically, Battiste sues Goodwein in Count I, Winter sues Barcelo in Count II,

_____

[2] Because Plaintiffs' claims against the arresting deputies are based on wrongful arrest and violation of free speech rights, they are properly addressed under the Fourth and First Amendments and not the Fourteenth. Indeed, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*,

Hamblin sues Wilkin in Count III, and Cardona sues Barcelo in Count IV.

In their Motion for Summary Judgment on these claims, the arresting deputies argue that they are entitled to judgment as a matter of law on the basis of qualified immunity. Qualified immunity protects a public actor sued under federal law from liability unless his or her conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In order to be entitled to qualified immunity, the public actor must have acted within the scope of his or her discretionary authority when the allegedly wrongful acts occurred. *Id.* at 1248. Here, it is undisputed that Wilkin, Goodwein, and Barcelo acted within their discretionary authority as deputies with the BSO with they arrested Plaintiffs.

Because Wilkin, Goodwein, and Barcelo are entitled to qualified immunity, it is Plaintiffs' burden to show that such qualified immunity is inappropriate under the circumstances presented here. *See id.* The qualified immunity analysis is a two-step inquiry. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, the Court must determine whether the alleged facts, if true, establish that the defendants' conduct violated a constitutional right. *Id.* If the alleged conduct does not amount to a constitutional violation, the inquiry ends. *Id.* If the alleged conduct does amount to a constitutional violation, the Court asks whether the right was "clearly established" at the time. *Id.*; *see also, e.g.*, *Vinyard v. Wilson*, 311 F.3d 1340, 1349-50 (11th Cir. 2002). The standard for deciding if an officer's conduct violated clearly established law is purely objective; the officer's subjective intent or belief is irrelevant. *See Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990).

---

490 U.S. 386, 395 (1989)). Because the Fourth and First Amendments provide explicit sources of protection against, respectively, unreasonable seizure and violation of free speech rights, those Amendments and not the more generalized right to substantive due process govern the constitutionality of the arresting deputies' actions. *See, e.g.*, *Hamm v. Powell*, 893 F.2d 293, 294 (11th Cir. 1990) ("[U]nder [*Graham v. Connor*], the Supreme Court made clear that . . . courts must analyze claims of wrongful arrest and force 'under the Fourth Amendment's objective reasonableness standard.'") (quoting *Graham v. Connor*, 490 U.S. at 387); *Brandenburg v. Housing Auth. of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001) (affirming summary judgment on substantive due process claim as being duplicative of First Amendment retaliation claim). The Court also notes that City made this argument in its Motion for Summary Judgment, and Plaintiffs did not address it in their Response.

The Court will undertake this analysis with respect to Plaintiffs' claims against Wilkin, Goodwein, and Barcelo. In so doing, the Court keeps in mind "the fact that we generally accord official conduct a presumption of legitimacy." *Epps v. Watson*, 492 F.3d 1240, 1243 (11th Cir. 2007) (internal quotation and citations omitted). However, as this is the BSO Defendants' Motion for Summary Judgment, the Court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to Plaintiffs and determine whether that evidence could reasonably sustain a jury verdict in their favor.

In preparation for the qualified immunity analysis, the Court sets forth the following undisputed facts regarding the circumstances of Plaintiffs' arrests. Shortly before encountering Plaintiffs on the railroad tracks, the BSO Field Force (including Wilkin, Goodwein, and Barcelo as members of a Field Force arrest team) was marching north up First Avenue in a line formation at least four people deep. *See, e.g.*, Video, D.E. #151. From the video evidence, it is apparent that the Field Force members were outfitted in riot gear, complete with helmets, face masks, and gas masks, and that the front line of the Field Force held large shields. The Field Force was moving through downtown Miami in an attempt to disperse the crowd near the Bayfront area on Biscayne Boulevard after some individuals had become violent. *See, e.g.*, Barcelo Depo. at 41, 43; Reffett Depo. at 33-34; Brooks Depo. at 59. All three arresting deputies were marching behind the Field Force's front line, *see* Wilkin Depo. at 29, 62-63; Goodwein 2004 Depo. at 8; Barcelo Depo. at 43, and Brooks and Reffett were marching in the front of the line, *see* Brooks Depo. at 69; Reffett Depo. at 56. As the Field Force marched north up First Avenue they encountered Plaintiffs as Plaintiffs moved west along the railroad tracks, coming from the Field Force's right side. *See, e.g.*, Goodwein 2008 Depo. at 46; Brooks Depo. at 66-67. At this point either Brooks or Reffett called out for the arrest team and Reffett took a portion of the Field Force, including Wilkin, Goodwein, and Barcelo, onto the tracks. While Reffett and a portion of the Field Force broke from the line and moved down the railroad tracks, where Plaintiffs were ultimately arrested, Brooks and the remainder of the Field Force continued marching north up First Avenue. Brooks Depo. at 73-75; Reffett Depo. at 67.

### a.    Claims Under the Fourth Amendment

Plaintiffs seek to recover from Wilkin, Goodwein, and Barcelo based on section 1983 claims for false arrest, which implicate the Fourth Amendment right to be free from unreasonable searches and seizures. "Plainly, an arrest without probable cause violates the right to be free from an

5

unreasonable search under the Fourth Amendment." *Durruthy v. Pastor*, 351 F.3d 1080, 1088 (11th Cir. 2003). Indeed, "it is clearly established that an arrest made without probable cause violates the Fourth Amendment." *Davis v. Williams*, 451 F.3d 759, 764 n.8 (11th Cir. 2006) (citing *Thornton v. City of Macon*, 132 F.3d 1395, 1399 (11th Cir. 1998)).

In general, "[p]robable cause to arrest exists if the facts and circumstances within the officer's knowledge, of which he has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed or is committing an offense." *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996) (citation omitted). However, where qualified immunity applies to a claim of false arrest under section 1983, the "appropriate inquiry . . . is not whether there was probable cause, but whether there was 'arguable' probable cause to arrest." *Walker v. Prieto*, 414 F. Supp. 2d 1148, 1152 (S.D. Fla. 2006). Accordingly, a court applying the qualified immunity test to a claim of false arrest "must determine whether reasonable officers in the same circumstances and possessing the same knowledge as [the defendant] could have believed that probable cause existed to arrest" the plaintiff. *Von Stein*, 904 F.2d at 579. "If reasonable public officials could differ on the lawfulness of a defendant's actions, the defendant is entitled to qualified immunity." *Storck v. City of Coral Springs*, 354 F.3d 1307, 1314 (11th Cir. 2003) (citing *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)).

In their Motion the arresting deputies make several arguments as to why they are entitled to qualified immunity from Plaintiffs' section 1983 false arrest claims. The Court will analyze each in turn.

### i.     Trespassing

Wilkin, Goodwein, and Barcelo argue that they had arguable probable cause to arrest Plaintiffs for trespassing on private property: the railroad track on which they were arrested.[3] The

---

[3]  Plaintiffs were not actually arrested for trespassing – the arrest affidavits for all four Plaintiffs stated: "Pursuant to mutual aid agreement subject was given dispersal order by Major Burden MPD after given the opportunity to disperse, subject became violent and had to be arrested." It is undisputed that Plaintiffs did not engage in "violence" that caused them to be arrested, and that the arresting deputies did not draft the arrest affidavits themselves or examine them closely before signing them. However, "'the validity of an arrest does not turn on the offense announced by the officer at the time of the arrest' . . . [S]o long as probable cause existed to arrest [the plaintiff] for any offense, the arrest and detention are valid even if probable cause was lacking as to some offenses, or even all announced charges." *Whittington v. Town of Surfside*, 490 F. Supp. 2d 1239,

arresting deputies invoke Florida Statutes Section 810.09, which states in pertinent part:

> A person who, without being authorized, licensed, or invited, willfully enters upon or remains in any property other than a structure or conveyance:
>
>   1.    As to which notice against entering or remaining is given, either by actual communication to the offender or by posting, fencing, or cultivation as described in s. 810.011
>
> commits the offense of trespass on property other than a structure or conveyance.

Fla. Stat. § 810.09(1)(a).   The four elements that must be satisfied to establish the crime of trespass under section 810.09 are: "1) willfully entering upon or remaining in any property; 2) other than a structure or a conveyance; 3) without being authorized, licensed or invited; 4) where notice against entering or remaining is given either by actual communication to the offender or by posting, fencing or cultivation." *Smith v. State*, 778 So. 2d 329, 330 (Fla. 2nd DCA 2000) (citing *A.L. v. State*, 675 So. 2d 703, 704 (Fla. 3d DCA 1996)).   Florida's trespass statute also states that "[t]he unauthorized entry by any person into or upon any enclosed and posted land shall be prima facie evidence of the intention of such person to commit an act of trespass."  Fla. Stat. § 810.12(1).  Further, the term "authorized person" means "any owner, his or her agent, or a community association authorized as an agent for the owner, or any law enforcement officer whose department has received written authorization from the owner, his or her agent, or a community association authorized as an agent for the owner, to communicate an order to leave the property in the case of a threat to public safety or welfare."  *Id.* § 810.09(3).

    Here, it is undisputed that Plaintiffs were arrested as they walked west on the railroad tracks that run parallel to and in between Northeast Sixth and Seventh Streets in downtown Miami, after they turned left off of Northeast Second Avenue.  It is undisputed that there were "no trespassing" signs posted by the owner of the railroad along the tracks.  *See* Brooks Depo. at 116-17; Brooks Aff. at 3; Photographs, D.E. #170.  There is no record evidence suggesting that the owner of the tracks or an agent for such owner authorized Plaintiffs' presence, in accordance with section 810.09(3).

---

1251 (S.D. Fla. 2007) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1196 (11th Cir. 2002)).  Thus, the Court will analyze the circumstances of Plaintiffs' arrest to determine whether there was arguable probable cause to arrest them for trespassing on the railroad tracks.

In response to the arresting deputies' argument that they had arguable probable cause to arrest for trespassing, Plaintiffs emphasize that they were instructed to walk along the tracks by Miami-Dade police officers.  Indeed, it does appear from the undisputed facts that Plaintiffs were so instructed.  *See, e.g.*, Battiste Depo. at 34; Winter Depo. at 38-39; Hamblin Depo. at 37; Cardona Depo. at 20-21.  If proven, the fact that Plaintiffs were told to walk along the railroad tracks by other law enforcement officers would negate the "willful" element of the crime of trespass – yet that fact is not determinative of whether the arresting deputies had arguable probable cause to arrest Plaintiffs for trespassing.  As the Eleventh Circuit stated in *Hutton v. Strickland*, "[t]he [appellants'] beliefs concerning the legality of their entry onto the [subject private property] are irrelevant to qualified immunity analysis, which examines the conduct of the subject government officials only."  919 F.2d 1531, 1540-41 (11th Cir. 1990).

However, as Plaintiffs point out, and is apparent from the record evidence, Winter did tell one of the arresting officers that she and others on the track were "sent this way by the police back there on the corner."  Video at 17.01.33; *see also* Winter Depo. at 47 ("And I said, 'But we followed the orders that the police gave us, which was to turn this way.'").  Winter testified that in response, "all they said was, 'we're following orders.'"  Winter Depo. at 47.  However, Winter's arresting deputy, Barcelo, testified that he never heard Winter state that she and the others on the tracks had been  ordered to walk that way.  Barcelo Depo. at 57.  Further, the video demonstrates that a man in a white shirt also being arrested on the tracks informed one of the officers that he and other protesters were "told by the police to come this way."  Video at 17.02.07.

It is undisputed that none of the arresting deputies themselves remember seeing Miami-Dade police officers near the railroad tracks, although they did generally recall seeing officers from other law enforcement agencies in the downtown area throughout the day.[4]  Further, the Court

---

[4]  Wilkin stated he remembered seeing many different police forces in the downtown area generally throughout the day, but only remembers seeing BSO officers in the vicinity of the railroad tracks.  Wilkin Depo. at 67, 82.  Goodwein did remember seeing officers in a different uniform than the BSO's in the general area around railroad tracks, Goodwein 2008 Depo. at 42, but did not remember seeing any police on the other side of the people arrested on the railroad tracks, Goodwein 2004 Depo. at 13, 16.  Barcelo testified that he remembered seeing officers from various agencies throughout the day, and remembered seeing officers from another agency marching near him before he reached the railroad tracks, but stated that once there he did not see any other law enforcement officers.  Barcelo Depo. at 41-42, 84-85.

acknowledges that the circumstances surrounding Plaintiffs' arrest were unusual – for example, it is undisputed that by midday on November 20, 2003, some of the FTAA protestors had become violent in the area around Biscayne Boulevard.  Brooks Depo. at 59; Fernandez Aff. at 1; Fernandez Depo. at 62-64.[5]  While this is a close case, in examining the facts in the light most favorable to Plaintiffs the Court finds that the reasonableness of Plaintiffs' arrest for trespassing is properly a jury question.  Critical to the Court's analysis is *Killmon v. City of Miami*, 199 Fed. Appx. 796 (11th Cir. 2006).   The plaintiff in that case was arrested in the same circumstances as Plaintiffs here, at virtually the identical time and place.   In assessing the arresting officers' motion to dismiss the section 1983 claims against them, the court stated:

> [T]he Officers argue that, because walking on railroad tracks is a criminal trespass under Florida law, arguable probable cause existed to arrest the Protesters. This argument also fails. As the district court explained, the complaint alleges the absence of at least one element of the offense of trespass as defined by Florida law-that a person "willfully enter[ ] upon or remain[ ] in any property other than a structure or conveyance." Fla. Stat. Ann. § 810.09(1)(a). The Protesters allege that they were directed, even "herded," onto the railroad tracks by police officers. They also allege that the law enforcement operation that day was highly coordinated. *It is reasonable to infer that the Officers and their commander were aware that the dispersing protesters had been directed onto the railroad tracks by other police officers, which means that the Officers should have known that the Protesters were not on the tracks willfully.* The complaint adequately alleges that the Protesters were arrested in violation of their clearly established Fourth Amendment rights.

*Id.* at 800 (emphasis added).

Here, the record does not evince such highly coordinated activity or communication

---

[5] BSO Lieutenant Crane, who was marching with the BSO Field Force, testified that violent protestors tried to penetrate security blockades at the Intercontinental Hotel, lit wooden pallets on fire, and threw rocks and chunks of concrete at the security forces.  Crane Depo. at 76-81; *see also* Fernandez Depo. at 70; Brooks Depo. at 64, 67-68.  Plaintiffs admitted that on November 20, 2003 some protestors became "extremely violent," that one group of protestors attempted to tear down an access gate in front of the Intercontinental Hotel.  *See* D.E. #164 at 5.  Plaintiffs also admitted that other protestors began throwing rocks, bottles, paint, and tear gas, and that as a result of these violence, Major Burden of the MPD (who coordinated all ground security forces at the FTAA summit), Deputy Chief Fernandez, and others began giving repeated orders to disperse from the downtown area.  *See id.*

mechanisms between law enforcement agencies.[6]  However, the Eleventh Circuit held that the mere *allegation* of such coordination was enough to support the reasonable inference that the officers should have known the protestors were not on the tracks willfully.  While the Eleventh Circuit reviewed a motion to dismiss in that case, its logic sheds some light on what is "reasonable" to expect law enforcement officers to have known in those circumstances.  As the Eleventh Circuit has also stated, while a police officer is not required to explore and eliminate every plausible claim of innocence before making an arrest, "an officer may not choose to ignore information that has been offered to him or her. . . . Nor may the officer conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts."  *Kingsland v. City of Miami*, 382 F.3d 1220, 1229 (11th Cir. 2004).  In this case both Winter and the man in the white shirt stated to deputies on the scene that they had been ordered by other law enforcement officers to walk along the railroad tracks, and it is apparent from the record that the officers who gave that order were less than a block away, on Second Avenue.  In fact, Reffett himself was able to see the Miami-Dade officers as he moved down the tracks – and when he walked down to speak with one of them, he learned that the Miami-Dade officers had in fact ordered Plaintiffs to walk along the tracks.  Reffett Depo. at 47-48.[7]

Thus, there are factual questions here regarding whether Barcelo or any other arresting deputy heard Winter's or the other man's statements about being ordered to walk along the tracks, how easily they could have investigated those claims, and generally whether an officer in those

_____

[6]  For example, it is undisputed that the BSO officers were not in direct radio contact with the Miami-Dade officers.  Reffett Depo. at 47.  Reffett further stated that the shoulder microphone radios they used were largely useless, because of the surrounding noise.  *Id.* at 39.  Brooks testified that he did receive directions over a radio connection, but these were issued by the City of Miami.  Brooks Depo. at 76.  Brooks further testified that had no contact with any of the Miami-Dade police officers in the vicinity of the railroad tracks, *id.* at 80, and was not aware of their presence near the tracks, *id.* at 82.  Fernandez, who was walking with the BSO Field Force, testified that he did not remember seeing Miami-Dade police officers near the railroad tracks.  Fernandez Depo. at 117.  He stated that the portion of Second Avenue near the railroad tracks was "our" area of responsibility, presumably meaning the City's.  *Id.* at 117.

[7]  Moreover, Fernandez testified that each agency providing security at the summit had its own area of responsibility in downtown Miami – the police officers with Miami-Dade County were primarily concerned with the Port of Miami and the entrance thereto, around Sixth and Seventh Streets and Biscayne Boulevard, which is only one block from where they were stationed at the end of the railroad tracks.  Fernandez Depo. at 106, 108.

10

circumstances should have known that Plaintiffs were not on the tracks willfully.  While a close question, the Court ultimately believes that whether the arresting deputies had arguable probable cause to arrest Plaintiffs for trespassing is properly a jury issue.

### ii.      Failure to Disperse

Wilkin, Goodwein, and Barcelo also argue that they are entitled to qualified immunity because they had arguable probable cause to arrest Plaintiffs for failing to disperse.  The Court rejects this argument.  It is undisputed that Major Burden, Chief Fernandez, and other high-level law enforcement personnel issued orders to disperse from the downtown area around Biscayne Boulevard on November 20, 2003.  However, it is also undisputed that none of the arresting deputies actually heard a dispersal order issued in the vicinity of the railroad tracks.  Wilkin Depo. at 75; Goodwein 2008 Depo. at 76-77; Barcelo Depo. at 81; Pulitano Depo. at 39.  Further, no dispersal order can be heard on the video during the time the BSO Field Force is marching up First Avenue and approaching the railroad tracks.  Plaintiffs state, and the record evidence seems to support, that the last dispersal order given by Major Burden was at around 3:00 p.m. on Biscayne Boulevard.  Burden Depo. at 39.  Plaintiffs were arrested at 5:00 p.m. several blocks away as they walked home after participating in protest events.

Under these circumstances, the Court finds that the arresting deputies had no arguable probable cause to arrest Plaintiffs for failing to disperse when the deputies themselves did not hear a dispersal order anywhere near the area, or anywhere close to the time, of Plaintiffs' arrest.  In any case, it is clear from the record evidence that at the time of Plaintiffs' arrest they were walking west, away from Biscayne Boulevard – in other words, they *were* dispersing from the downtown area.[8]

### iii.      Following Orders

The Court also rejects the arresting deputies' argument that they are entitled to qualified immunity because they were ordered to arrest Plaintiffs by their superior officers, Brooks and/or Reffett.  The Eleventh Circuit has upheld qualified immunity for officers who followed their superiors' order where the record "reflect[ed] no reason why any of [the defendant officers] should question the validity of that order."  *Brent v. Ashley*, 247 F.3d 1294, 1306 (11th Cir. 2001).

---

[8] The BSO Defendants' Statement of Material Facts itself states that Plaintiffs were observed "on the railroad tracks to the east, moving westward towards the Field Force."  D.E. #145 at ¶ 23; s*ee also, e.g.*, Barcelo Depo. at 54 (stating that the protestors were "walking" towards them).

11

However, the Eleventh Circuit has also stated that "since World War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a 'reason why any of them should question the validity of that order.'"  *O'Rourke v. Hayes*, 378 F.3d 1201, 1210 n.5 (11th Cir. 2004) (quoting *Brent*, 247 F.3d 1294).

Here, the arresting deputies argue that they arrested Plaintiffs because they were ordered to – that when they heard the call for an arrest team, they followed that order and arrested the first individuals they saw on the railroad tracks.  Wilkin Depo. at 62-63; Goodwein 2008 Depo. at 47-48; Barcelo Depo. at 51-52.  They also testified that they did not see Plaintiffs committing any crime, except for trespassing and failing to disperse.  Wilkin Depo. at 77; Goodwein 2004 Depo. at 11-12; Barcelo Depo. at 52; Pulitano Depo. at 39.

Viewing the facts in the light most favorable to Plaintiffs, there is a genuine issue of material fact as to whether the arresting deputies should have known not to follow the order to make arrests on the railroad tracks.  The Court has already held there is a genuine issue as to whether the arresting deputies had arguable probable cause to arrest Plaintiffs for trespassing, based on whether the arresting deputies knew or should have known that Plaintiffs were not on the tracks willfully.  It follows that if the arresting deputies knew or should have known Plaintiffs were not on the tracks willfully, they would have had a reason to question the validity of an order to arrest them (given that no arguable probable cause existed to arrest Plaintiffs for any other crime).  Thus, the arresting deputies are not entitled to qualified immunity on the basis of their "following orders" argument.

### iv.    Fellow Officer Rule

The arresting deputies are also not entitled to qualified immunity based on their "fellow officer rule" argument.  In Florida "[t]he fellow officer rule allows an arresting officer to assume probable cause to arrest a suspect from information supplied by other officers."  *Voorhees v. State*, 699 So. 2d 602, 609 (Fla. 1997); *see also, e.g.*, *Dewberry v. State*, 905 So. 2d 963, 967 (Fla. 5th DCA 2005) ("The fellow officer rule, sometimes referred to as the collective knowledge doctrine, allows the collective knowledge of police investigating a crime to be imputed to each member of the investigation.").

Here, the arresting officers testified that they were ordered to arrest Plaintiffs because a superior officer, apparently either Brooks or Reffett, called out "arrest team" or words to that effect.

12

*See* Wilkin Depo. at 62-63; Goodwein 2008 Depo. at 47-48; Barcelo Depo. at 51-52.  However, Brooks testified that he did not possess any knowledge regarding criminal activity by the individuals walking on the tracks.  Brooks Depo. at 73.  Reffett testified that the only knowledge he possessed with respect to Plaintiffs' criminal activity had to do with their trespassing on the tracks.  Reffett Depo. at 63.  Thus, the "fellow officer" rule does not apply here because there is no "collective knowledge" to impute to the arresting deputies – neither Brooks nor Reffett possessed any information supporting even arguable probable cause to arrest Plaintiffs.

In sum, insofar as the arresting deputies' Motion for Summary Judgment seeks judgment as a matter of law on Plaintiffs' false arrest claims, that Motion is denied.

### b.     Claims Under the First Amendment

In addition to their false arrest claims, Plaintiffs also assert free speech claims – they allege that they were arrested in retaliation for exercising their First Amendment rights in attending the FTAA summit protest.  In general, the right of an individual to be free from retaliation for his or her exercise of First Amendment freedoms is clearly established.  *See Bennett v. Hendrix*, 423 F.3d 1247, 1255-56 (11th Cir. 2005) ("This Court and the Supreme Court have long held that state officials may not retaliate against private citizens because of the exercise of their First Amendment rights.").  "The reason why such retaliation offends the Constitution is that it threatens to inhibit exercise of the protected right."  *Id.* at 1253 (internal quotation and citation omitted).

To recover in a retaliation claim, a plaintiff must establish (1) that his speech or act was constitutionally protected, (2) that the defendant's retaliatory conduct adversely affected the protected speech or act, and (3) that there is a causal connection between the retaliatory actions and the adverse effect on the protected speech or act.  *Id.* at 1250.  "A plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights."  *Id.* at 1254. Further, "[t]he effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable."  *Id.* (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).

Here, the arresting deputies are not entitled to judgment as a matter of law on Plaintiffs' First Amendment claims.  Regarding the first element of a proper retaliation claim, it is clear that Plaintiffs' participation in the FTAA summit protest constituted protected speech.  *See, e.g.,*

*Pritchard v. Carlton*, 821 F. Supp. 671, 674 (S.D. Fla.1993) ("The speech component of the First Amendment is far-reaching and includes various methods of communication, including a political speech or rally.") (citing *Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367, 390 (1969)).

Regarding the second element, the Court finds that being subjected to the same treatment as described by Plaintiffs here – that is, an alleged arrest without probable cause, sitting in a transport vehicle for multiple hours while handcuffed, being taken to a detention facility and held overnight before being released on bond – would likely deter a person of ordinary firmness from exercising his or her First Amendment rights. *See* Battiste Depo. at 50-55; Cardona Depo. at 32-38; Winter Depo. at 59-68; Hamblin Depo. at 54-66.

Finally, regarding the third element, whether there was a causal connection between Plaintiffs' speech and the alleged retaliatory action, the Court finds there is enough of a factual issue here to send the question to a jury. According to the record, all four Plaintiffs were arrested while wearing clothing that suggested affiliation with a labor union or expressed an opinion about the FTAA. Cardona Depo. at 25 (he wore a t-shirt suggesting affiliation with a steelworkers' union); Winter Depo. at 21 (she wore a t-shirt bearing the slogan, "FTAA Sucks"); Battiste Depo. at 16 (he wore an orange vest identifying him as an AFL-CIO union peacekeeper); Hamblin Depo. at 10-13 (the United Steel Workers union asked him to provide security at the summit, and he wore clothing identifying him as a member of that security force). It is also apparent from the video that a man bearing no union paraphernalia was allowed to walk across the railroad tracks unheeded as Plaintiffs were being arrested. *See* Video at 17:01:00.

In sum, given the record evidence, which the Court must construe in the light most favorable to Plaintiffs, there is a genuine issue as to whether Plaintiffs were arrested in retaliation for participating in the FTAA protest.[9] As such, insofar as the arresting deputies' Motion sought judgment as a matter of law on Plaintiffs' First Amendment retaliation claims, that Motion is denied.

### 2.    Count V against Brooks and Reffett: Supervisory Liability

BSO Defendants Brooks and Reffett have moved for summary judgment on Count V, in which Plaintiffs seek to recover against them under section 1983 based on their "supervisory

---

[9] However, if it turns out that the arresting deputies had arguable probable cause to arrest Plaintiffs, they are entitled to qualified immunity on these First Amendment claims. *See Redd v. City of Enterprise*, 140 F.3d 1378, 1383 (11th Cir. 1998).

liability." Specifically, Plaintiffs claim that Brooks and Reffett are liable for their unlawful arrests and violation of their free speech rights because they "unlawfully and without probable cause issued orders that subordinate officers seize, detain and arrest Plaintiffs." SAC ¶ 139.

"It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotation and citations omitted). A supervisor may only be subject to "direct liability" for his own actions or, under limited circumstances, supervisory liability for the actions of his subordinates. *See Holloman v. Harland*, 370 F.3d 1252, 1263 (11th Cir. 2004). Indeed, a supervisor is liable for the actions of his subordinates "either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation." *Braddy v. Fla. Dep't of Labor & Empl. Sec.*, 133 F.3d 797, 802 (11th Cir. 1998) (quoting *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990)). One of the ways to establish such a "causal connection" is by offering facts supporting "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal quotation and citations omitted). "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." *Id.* at 1360-61 (internal quotation and citation omitted).

Based on the record evidence, there appears to be an issue of fact as to Brooks' and Reffett's respective roles in ordering Plaintiffs' arrests such that those Defendants are not entitled to judgment as a matter of law. According to Brooks, upon spotting people walking along the railroad tracks he issued an order to Reffett (the exact wording of which he did not recall), with the intent that Reffett "take appropriate police action, whether it be arrest, whether it be disbursal, whatever action necessary to deal with those persons on the railroad tracks, because they presented a threat to the field force because as we would pass our flank would be exposed." Brooks Depo. at 72. Brooks testified his order to Reffett was to "take his squad along with an arrest team, to go down to and arrest persons if they were . . . committing crimes, and disburse [sic] the ones that weren't." *Id.*; *see also id.* at 71 ("I stopped the Field Force and directed Chief Raffet [sic] to take his personnel down and deal with the people on the railroad tracks."). According to Brooks, he issued that initial order

to Reffett, and other officers down the chain of command repeated the phrase "arrest team, arrest team" to communicate the order to other officers. *Id.* at 110; *see also* Video at 16:59:21. After issuing this order, Brooks and the remainder of the Field Force continued walking north on First Avenue. Brooks Depo. at 73-74. Meanwhile, Reffett took a portion of Field Force unit Echo, including an arrest team, to deal with the people on the railroad tracks. Brooks did not see Plaintiffs' arrests and did not return to the tracks that day. *Id.* at 75, 78.

Reffett testified that upon reaching the railroad tracks, he was directed by Brooks to "take charge," which he interpreted as an order to "move the personnel [sic] out of the area." Reffett Depo. at 44. Reffett testified that "[t]o me, [Brooks' order] meant to move [the people on the tracks] out of that area, away from the – off the railroad tracks, away from the stones and so forth, because that's the threat. And – which would mean, use a line formation to move them down to the end and get them off the street." *Id.* at 44-45. Reffett testified that he heard multiple voices calling "arrest team," and that the main voice was Brooks,' *id.* at 82, but that he did not know why the arrest team was being called out, *id.* at 47. Reffett stated that he then moved in front of the arrest team and tried to get them into a line formation, and began moving down the tracks. *Id.* at 47. While he initially did not see an organized line of Miami-Dade police officers at the other end of the tracks, when he began walking he saw Miami-Dade officers at the other end of the tracks, and also saw that one of those officers was walking toward him. *Id.* at 47, 52-53. Reffett then walked down to meet that officer midway down the tracks, and learned from the Miami-Dade officer that they had directed Plaintiffs onto the tracks. *Id.* at 47-48. In the meantime, the BSO arrest team was making arrests behind him on the tracks that he did not witness, and by the time he turned around and began walking back, Plaintiffs had already been arrested. *Id.* at 48, 74, 118. Reffett did not see these arrests taking place nor did he play any role in deciding whom to arrest, and assumed that the arrestees had been identified as being among the violent protesters near Bayfront Park. *Id.* at 48, 71, 118.

According to the arresting deputies themselves, each one testified to hearing an order to arrest the individuals on the tracks. While Goodwein and Barcelo testified that Reffett made that call, Pulitano and Wilkin did not remember who made it. Wilkin Depo. at 62 (he did not remember who issued the order, but heard someone say, "All the guys on the train tracks. Effect an arrest."); Goodwein 2008 Depo. at 48 (Reffett called out "arrest team take them," meaning the people on the

tracks); Barcelo Depo. at 51 (Reffett called out "arrest.  Make the arrest."); Pulitano Depo. at 35 (he did not remember who issued the order, but believed someone issued an order to arrest the people on the tracks).

Given the record evidence, there is a genuine issue of fact as to what roles Brooks and Reffett played in Plaintiffs' arrests – that is, whether they directed the arresting deputies to act unlawfully or knew the deputies would act unlawfully and failed to stop them.  *Cottone*, 326 F.3d at 1360.  It is clear from their depositions that the arresting deputies heard what they thought to be an order to arrest the individuals walking along the tracks.  Goodwein and Barcelo identified Reffett as the source of that order, but Reffett testified that Brooks called for the arrest team and that Reffett himself did not know why the arrest team was summoned to the tracks.  Thus, because there exist issues of fact regarding who called for the arrest team and what that call meant – in other words, whether the individual who made the call understood that Plaintiffs would be arrested without probable cause – neither Brooks or Reffett are entitled to summary judgment on the supervisory liability claims against them.  Accordingly, insofar as Brooks' and Reffett's Motion for Summary Judgment seeks judgment as a matter of law on Count V, it is denied.

### 3.    Counts VI-VII against Barcelo and Pulitano: Excessive Force

In Counts VI and VII Cardona seeks to recover under section 1983 against Barcelo and Pulitano for excessive force during the course of his arrest "that deprived [him] of constitutionally protected rights under the Fourth and Fourteenth Amendments."  SAC ¶¶ 142, 147.[10]  Barcelo and Pulitano moved for summary judgment on these claims, asserting qualified immunity.  They argue that there is no genuine issue as to whether Cardona physically resisted a lawful arrest, and also no genuine issue that both deputies used reasonable force to effect Cardona's arrest.

---

[10]  The Supreme Court has made clear that "[w]here . . . the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment . . . ."  *Graham v. Connor*, 490 U.S. at 394.  "Fourteenth Amendment analysis does not begin until 'after the incidents of arrest are completed, after the plaintiff has been released from the arresting officer's custody, and after the plaintiff has been in detention awaiting trial for a significant period of time.'"  *Garrett v. Athens-Clarke County, Ga.*, 378 F.3d 1274, 1279 n.11 (11th Cir.  2004) (quoting *Gutierrez v. City of San Antonio*, 139 F.3d 441, 452 (5th Cir. 1998)).  Thus, the Court will analyze Cardona's excessive force claims under the Fourth Amendment only.

### a.  Violation of Constitutional Right

According to the Supreme Court, "where . . . the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Graham v. Connor*, 490 U.S. at 394 (alterations in original).  While it is well-established that using excessive force in carrying out an arrest does violate the Fourth Amendment, it is equally clear that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396 (citation omitted).  Violations of the Fourth Amendment are determined with reference to an "objective reasonableness" standard, *id.* at 388, but there is no bright line rule for evaluating the reasonableness of an officer's actions.  Rather, such a determination must be made based on the unique facts and circumstances of each case, taking into account such factors as: (1) the severity of the crime, (2) whether the suspect poses an immediate threat to the officers, and (3) whether the suspect is resisting arrest or attempting to evade arrest by flight.  *Id.* at 396; *see also Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993).  Further, the Eleventh Circuit has held that "the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000); *see also Stachel v. City of Cape Canaveral*, 51 F. Supp. 2d 1326, 1331-32 (M.D. Fla. 1999) (granting qualified immunity to fire inspector and deputy sheriff where "the actual force used [on the plaintiff] was minimal and not plainly unlawful").

### i.  Barcelo

According to Barcelo in his deposition, when he told Cardona to get on the ground Cardona refused to comply and started "lifting his arms, waiving [sic] his arms."  Barcelo Depo. at 59.  Then, according to Barcelo, Cardona was "placed on the ground with a shield, without using any electronic device or anything," and while on the ground Cardona was "screaming" and kicking his legs.  *Id.* at 60.  Barcelo then stated he demanded that Cardona "stop resisting" and put his hands behind his back but Cardona refused to comply, and at that point Barcelo used a "quick burst" of his electrified shield to "control him" while he was already on the ground.  *Id.* at 63-64.  Barcelo further stated that after he applied the electronic shield, Cardona began complying and put his hands behind his back to be handcuffed.  *Id.* at 65.  Barcelo testified that he did not see anyone apply a taser to Cardona.  *Id.* at

18

67.

Cardona tells a different story in his deposition.  According to him, a police officer yelled at him, approached him while carrying a shield, and "hit [him] in the chest."  Cardona Depo. at 22. Cardona stated that he received no warning before being hit with the shield, and that he was not asked to get on the ground at any point.  *Id.* at 30.  Cardona believed the shield carried an electric charge because "it felt really strong, more stronger [sic] than what it should have been, and then I fell in [sic] my back."  *Id.* at 22, 30.  After falling to the ground as a result of being hit by the shield, Cardona stated, he turned around and put his hands behind his back to be handcuffed.  *Id.* at 22. After putting his hands behind his back, "police officers fell on [his] vertebral column" and one of them said "Don't move, son of a bitch."  *Id.*  Cardona stated that the officer who knocked him down with the shield never told him to get down on the ground, and that he was compliant at all times. *Id.* at 30.

Examining the record evidence in light of the *Graham v. Connor* factors, the Court finds that there is a genuine issue of fact as to whether Barcelo's use of force was reasonable under the circumstances. 490 U.S. at 396.  The Court has already held that the only possible basis for arresting Cardona was trespassing – a relatively innocuous crime.  As the Eleventh Circuit has stated, "more force is appropriate for a more serious offense and less force is appropriate for a less serious one." *Lee v. Ferraro*, 284 F.3d at 1198.  Further, based on Barcelo's and Cardona's testimony, there is a dispute of fact as to whether Cardona offered any resistance or posed any threat at all – Cardona claims he was completely compliant and shocked with an electronic shield for no reason and without warning, while Barcelo claims that Cardona was screaming, kicking, and uncooperative.[11]  While Barcelo refers the court to the video evidence as support that he is entitled to summary judgment, the Court does not agree.  All the video shows of Cardona's arrest is an officer yelling for Cardona

_____

[11]  The Court finds the following statement useful in this inquiry: "[c]ourts have consistently concluded that using pepper spray is excessive force in cases where the crime is a minor infraction, the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else. Courts have consistently concluded that using pepper spray is reasonable, however, where the plaintiff was either resisting arrest or refusing police requests, such as requests to enter a patrol car or go to the hospital." *Vinyard v. Wilson*, 311 F.3d at 1348.  Although the device used in this case was an electrified shield, not pepper spray, the Court believes this quote sheds light on the reasonableness of using a tool designed to inflict pain or discomfort to gain compliance.

19

to place his hands behind his back, and Cardona being handcuffed.  Video at 17:01:02.  The video is simply not clear enough to eliminate a genuine issue as to how much force was used on Cardona and under what circumstances.

In sum, examining the circumstances from the perspective of a reasonable officer in Barcelo's position, there is a genuine issue as to whether the "level of force [was] necessary in the situation at hand.'"  *Lee v. Ferraro*, 284 F.3d at 1197 (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1186 (11th Cir. 2001)).

### ii.    Pulitano

According to Pulitano, Cardona was being belligerent and uncooperative at the time of his arrest.  Pulitano testified that he witnessed two deputies struggling to arrest Cardona, who were having a "hard time" with Cardona because of his noncompliance.  Pulitano Depo. at 41.  Pulitano stated that Cardona was lying on his stomach with his arms "braced underneath his torso" and that he was refusing to place his hands behind his back to be put in restraints.  *Id.*  Pulitano stated that Cardona was repeatedly given an order to place his hands behind his back, which he refused to do.  *Id.* at 41, 44.  Pulitano then "drive stunned" Cardona in the calf for one to two seconds with his taser to "get compliance."  *Id.* at 41, 45.[12]  After Pulitano applied the taser, Cardona placed his arms behind his back to be handcuffed.  *Id.* at 45-46.  Pulitano did not see Cardona kicking or flailing his arms.  *Id.* at 45.  Pulitano further stated that he examined Cardona's leg after applying the taser and that there was "nothing wrong with him," and that he didn't remember "seeing anything" on his leg.  *Id.* at 63, 65.

In contrast, Cardona claims that after he was knocked to the ground with an electronic shield, he immediately turned around and put his hands behind his back to be handcuffed.  Cardona Depo. at 22.  According to Cardona, an officer handcuffed him and *then* applied a taser.  *Id.* at 23, 31.  Cardona stated that the officer who knocked him down with the shield never told him to get down on the ground, and that he was compliant at all times.  *Id.* at 30.   He testified that as a result of the incident, he received two burns on his leg that took 15-20 days to heal.  *Id.* at 26-27, 44.

---

[12] According to Pulitano, the "drive stun" setting is the least painful and incapacitating of the taser's two settings.  Pulitano Depo. at 27-29.  Rather than shooting out two prongs that deliver a powerful, total-body incapacitating charge, in "drive stun" mode the taser is placed directly against a person's skin and delivers a charge that causes pain only in the immediate area.  *Id.* at 29.

Examining the record evidence in light of the *Graham v. Connor* factors, there is a genuine issue of fact as to whether Pulitano's use of force was reasonable under the circumstances. 490 U.S. at 396. As stated above with respect to Barcelo, the Court has already held that the only possible basis for arresting Cardona was trespassing – a relatively innocuous crime. Further, based on Pulitano's and Cardona's testimony, there is a dispute of fact as to whether Cardona offered any resistance or posed any threat at all – Cardona claims he was already handcuffed and compliant when he was tased, and Pulitano claims Cardona was refused to offer his hands to be cuffed and generally resisted arrest. Further, while Pulitano states that "[t]he video of the arrest confirms Deputy Pulitano's recollection of events," the Court does not find the video to be so conclusive. As stated above, the video only shows that an officer yelled for Cardona to put his hands behind his back, and that Cardona was handcuffed. The details of the arrest are either not captured on the tape, or are obscured by other people in the video. This piece of evidence does not eliminate the genuine issue as to whether Pulitano used reasonable force in effecting Cardona's arrest.

In sum, examining the circumstances from the perspective of a reasonable officer in Pulitano's position, there is a genuine issue as to whether the "level of force [was] necessary in the situation at hand.'" *Lee v. Ferraro*, 284 F.3d at 1197 (quoting *Willingham v. Loughnan*, 261 F.3d at 1186).

### b.    Clearly Established Law

The second prong of the qualified immunity analysis is whether Cardona's right to be free from unreasonable force was "clearly established" at the time of Barcelo's and Pulitano's actions. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. The Eleventh Circuit has stated that conduct may be "clearly established" as unlawful in three ways: (1) through explicit statutory or constitutional statements, (2) through authoritative judicial decisions that establish "broad principles of law that are clearly applicable in a variety of factual contexts going beyond the particular circumstances of the decision that establishes the principle," and (3) most commonly, through "case law previously elucidated in materially similar factual circumstances." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1208-09 (11th Cir. 2007) (citing *Vinyard*, 311 F.3d at 1351-52). The only courts relevant to the determination of "clearly established" law are the U. S. Supreme Court, the Eleventh Circuit, and the Florida Supreme

Court.  *See Jenkins by Hall v. Talledega Bd. of Educ.*, 115 F.3d 821, 827 n.4 (11th Cir. 1997).

The Court's research reveals no case with facts materially similar to the case at hand, and Cardona himself does not offer any such factually similar case law.[13]  However, considering Cardona's version of the facts, such preexisting case law was unnecessary for it to be obvious to objectively reasonable officers facing Barcelo's and Pulitano's situation that their conduct violated Cardona's right to be free from excessive force.  Cardona was not suspected of committing any serious crime at the time he was shocked with an electronic shield and taser – at most, he could have been suspected of trespassing.  According to Cardona, he was completely compliant, was not trying to evade arrest, and posed no immediate threat of harm when Barcelo shocked him with an electronic shield without warning, throwing him to the ground, and when Pulitano tasered him after applying handcuffs.  Under these circumstances, Barcelo's and Pulitano's use of force was gratuitous and clearly disproportionate.  *See, e.g.*, *Lee v. Ferraro*, 284 F.3d at 1200.[14]  In sum, neither Barcelo or Pulitano are entitled to qualified immunity on Cardona's section 1983 excessive force claims.

Accordingly, insofar as those BSO Defendants seek judgment as a matter of law on Counts VI and VII in their Motion for Summary Judgment, that Motion is denied.

### 4.    Counts VIII-IX against the BSO: Battery and False Arrest

In Count VIII Cardona sues Broward County Sheriff Jenne (now Alfred T. Lamberti, *see* D.Es. #118-119) in his official capacity for battery under Florida state law.  In Count IX all Plaintiffs

---

[13]  Cardona does invoke *Reese v. Herbert*, 527 F.3d 1253 (11th Cir. 2008).  However, this case post-dates Cardona's November 20, 2003 arrest and could not have given Barcelo and Pulitano notice of the lawfulness of their actions.

[14]  Pulitano states in his Motion that "[i]t is black-letter law in this Circuit that the use of a taser gun in a 'difficult, tense, and uncertain situation" to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force," invoking the case *Zivojinovich v. Barner*, 525 F.3d 1059 (11th Cir. 2008).  BSO Mot. for Summ. J., D.E. #143 at 33.  This argument is of no avail to Pulitano – whether or not Cardona ignored police instructions or refused to cooperate is clearly in dispute here.  The same goes for Pulitano's reference to *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004), where the Eleventh Circuit held the use of a taser to effect an arrest did not constitute excessive force where the arrestee repeatedly ignored verbal requests to comply and had been "hostile, belligerent, and uncooperative."  Further, both of those cases post-dated Cardona's arrest, and so could not have provided any guidance to Pulitano or Barcelo in that situation.

sue the Sheriff for false arrest under Florida state law.[15]   According to section 768.28(9)(a),

> No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. . . . The exclusive remedy for injury or damage suffered as a result of an act, event, or omission of an officer, employee, or agent of the state or any of its subdivisions or constitutional officers shall be by action against the governmental entity, or the head of such entity in her or his official capacity, or the constitutional officer of which the officer, employee, or agent is an employee, unless such act or omission was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

Thus, Plaintiffs' theory in Counts VIII and IX is that the BSO is liable for the negligent actions of its employees in committing battery and false arrest.  According to Florida's waiver of sovereign immunity in section 768.28(9)(a), such claims are permissible against a government entity employer to the extent the employee did not act with bad faith, malicious purpose, or wanton and willful disregard of human rights, safety, or property.  *See, e.g.*, *Richardson v. City of Pompano Beach*, 511 So. 2d 1121, 1122 (Fla. 4th DCA 1987) (reversing trial court's determination that a municipality cannot ever be liable under section 768.28(9)(a) for intentional torts committed by its police officers, including excessive force and false arrest).

### a.    Count VIII: Battery

In Florida, "a battery consists of the intentional infliction of a harmful or offensive contact upon the person of another."  *Sullivan v. Atl. Fed. Sav. & Loan Ass'n*, 454 So. 2d 52, 54 (Fla. 4th DCA 1984) (citation omitted).  "A battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances."  *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996).

The BSO moved for summary judgment on this claim.  However, as explored above with

---

[15]   In suing the Sheriff of Broward County, Cardona essentially sues the agency Lamberti represents.  *See Ky. v. Graham*, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent.") (internal quotation and citations omitted).

respect to Cardona's section 1983 excessive force claims, the circumstances surrounding Cardona's arrest are in dispute. Because there is a genuine issue as to whether the use of force against Cardona was "reasonable under the circumstances," the BSO is not entitled to judgment as a matter of law on Cardona's battery claim.

### b.      Count IX: False Arrest

The BSO also moved for summary judgment on Count IX, in which Plaintiffs seek to recover for false arrest. Under Florida law, "[f]alse arrest is defined as the unlawful restraint of a person against that person's will. In a false arrest action, probable cause is an affirmative defense to be proven by the defendant." *Willingham v. City of Orlando*, 929 So. 2d 43, 48 (Fla. 5th DCA 2006) (citations omitted). "To show probable cause in a false arrest situation, it is not necessary that the arresting officer know facts that would absolutely prove beyond a reasonable doubt the guilt of the person charged; probable cause exists when the circumstances are sufficient to cause a reasonably cautious person to believe that the person accused is guilty of the offense charged." *Fla. Game and Freshwater Fish Com'n v. Dockery*, 676 So. 2d 471, 474 (Fla. 1st DCA 1996) (citation omitted). Further, "[i]nquiry into the reasonableness of an officer's perceptions of critical facts supporting an arrest does not focus upon facts not available to him at the time. By the same token, however, it must charge him with possession of all the information reasonably discoverable by an officer acting reasonably under the circumstances." *City of St. Petersburg v. Austrino*, 898 So. 2d 955, 959 (Fla. 2nd DCA 2005) (internal quotation and citation omitted). "A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest." *Id.* (internal quotation and citation omitted). Plaintiffs' state law false arrest claims survive the BSO's Motion for the reasons explained above with respect to their section 1983 false arrest claims: there exists a genuine issue of fact as to whether the arresting deputies had probable cause to arrest Plaintiffs for trespassing on the railroad tracks.

Accordingly, insofar as the BSO seeks judgment as a matter of law on Counts VIII and IX in its Motion for Summary Judgment, that Motion is denied.

**5.      Count X against the BSO: Failure to Train and Supervise**

In Count X, Plaintiffs seek to recover under section 1983 against the Broward County Sheriff in his official capacity in a failure to train and supervise claim.[16]  Plaintiffs allege that the Sheriff had a "long-standing, widespread history of failing to properly hire, train, supervise and discipline its officers for unlawful detentions and arrests, and/or for writing false allegations in police reports and/or arrest affidavits."  SAC ¶ 170.  As a result of such inadequate training and supervision, Plaintiffs claim, the individual BSO Defendants violated their Fourth and First Amendment rights – that is, arrested them without probable cause and in retaliation for protesting the FTAA summit, and with the use of arrest affidavits containing false allegations of criminal activity.

In general, a municipality such as the BSO cannot be held liable under section 1983 for the acts of its employees under a theory of *respondeat superior*.  *See Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) ("We have consistently refused to hold municipalities liable under a theory of *respondeat superior*.").  A municipality may only be held liable under section 1983 where there is a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *City of Canton, Oh. v. Harris*, 489 U.S. 378, 385 (1989); *see also Bd. of County Comm'rs v. Brown*, 520 U.S. at 404.  Specifically, a plaintiff may seek to establish a municipality's liability by identifying "either (1) an officially promulgated [municipal] policy or (2) an unofficial custom or practice of the [municipality] shown through the repeated acts of a final policymaker for the [municipality]."  *Grech v. Clayton County, Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (citations omitted).  Regardless of whether a plaintiff attempts to state a claim under section 1983 by alleging a policy or a custom, he or she must also identify an official who speaks with "final policymaking authority for [the municipality] concerning the act alleged to have caused the particular constitutional violation in issue."  *Id.* at 1330.  Indeed, "municipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).

Further, municipal liability may be based on a claim of inadequate training or supervision

_____

[16]  Again, this is essentially a claim against the BSO.  *See* Footnote 15; *Ky. v. Graham*, 473 U.S. at 165.

25

only where a municipality's failure to train or supervise its employees in a relevant respect evidences a *deliberate indifference* to the rights of its inhabitants, such that the failure "'can be properly thought of as a [municipal] policy or custom that is actionable under § 1983.'"  *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489-90 (11th Cir. 1997) (quoting *Canton*, 489 U.S. at 389); *see also Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1555 (11th Cir. 1989).   This standard presents Plaintiffs with a "very difficult burden to satisfy." *Samarco v. Neumann*, 44 F. Supp. 2d 1276, 1287 (S.D. Fla. 1999).  "In resolving the issue of a [municipality's] liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.  That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Canton*, 489 U.S. at 390-91 (citations omitted).  "Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.  Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal." *Id.* at 391.

Here, Plaintiffs claim that the BSO had a custom of failing to train in arresting without probable cause, and also a custom of failing to discipline officers who write false allegations in police reports and/or arrest affidavits.  SAC ¶ 169.  However, "[t]o establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality *knew* of a need to train and/or supervise in a particular area and the municipality made a *deliberate choice* not to take any action."  *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citations omitted) (emphasis added); *Young v. City of Augusta, Ga.*, 59 F.3d 1160, 1171-72 (11th Cir. 1995); *Wright v. Sheppard*, 919 F.2d 665, 674 (11th Cir. 1990); *Kerr*, 875 F.2d at 1556-57. "[W]ithout notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise." *Gold*, 151 F.3d at 1351.  For example, in *Wright v. Sheppard* the Eleventh Circuit held that a sheriff's department was not liable for a deputy's acts when "no evidence of a history of widespread prior abuse . . . put the sheriff on notice of the need for improved training or supervision." 919 F.2d at 674.  *See also Popham v. City of Talladega*, 908 F.2d 1561, 1564-65 (11th Cir. 1990) (finding no liability for failure to train when no pattern of incidents put the municipality on notice of a need to train).

26

Here, Plaintiffs claim that the BSO was provided with such notice because of its "custom and practice" of "falsifying police reports." Plaintiffs point to a practice called "multiple case clearance" or "exceptional case clearance" as evidenced by public statements issued by then-Sheriff Jenne and an independent report. D.E. #163-5; 163-6; 163-8. Based on this evidence it appears that around 2001-2003 the BSO experienced problems with law enforcement personnel "questionably" clearing cases, or removing them from the list of pending matters requiring continuing attention, without an arrest or prosecution. *See also* Brooks Aff. at 3 ("[T]he 'exceptional case clearance' issue involved the decision to terminate an 'open' or pending criminal investigation in the absence of an arrest or additional criminal charges, and the filing of a report documenting that decision."). The reason for such "questionable" clearances included failure to comply with certain reporting criteria, failure to enter data correctly, and failure to follow appropriate investigative procedures. Independent Report, D.E. #163-8. Even considering the evidence in the light most favorable to Plaintiffs, the Court finds this evidence insufficient to create a genuine issue as to whether the BSO was on notice of a need to train or discipline its law enforcement personnel with regard to type of wrongdoing alleged here. The "exceptional case clearance" issue has to do with erroneously closing pending cases without an arrest or prosecution, not making arrests in the absence of probable cause or with arrest affidavits bearing inaccurate statements regarding criminal activity. In the Court's view, the "exceptional case clearance" issue is not sufficiently related to Plaintiffs' claimed constitutional rights violations to have put the BSO on notice of a need to train or supervise.

Moreover, even if the "exceptional case clearance" issue was sufficiently related to Plaintiffs' claimed constitutional rights violations to put the BSO on notice of a need to train or supervise, Plaintiffs' own evidence would undercut their argument that the BSO made a *deliberate choice* not to take any action. *Gold*, 151 F.3d at 1351 (emphasis added). Plaintiffs' documents include two letters from the BSO Sheriff himself describing the extensive lengths to which he and the BSO went to address the problems brought to light by the "exceptional case clearance" issue. Such remedial action included a review of over 10,000 cases, additional training for all BSO deputies, new review and verifications processes, the hiring of outside legal counsel, and the commission of various audits. *See* D.Es. #163-5; 163-6. Even accepting the argument that the "exceptional case clearance" issue provided the BSO with notice of a need to train or supervise (and even accepting that that need was causally related to Plaintiffs' arrests), the evidence in the record indicates that the BSO made a

27

deliberate choice to take corrective action.[17]

In sum, the BSO is entitled to judgment as a matter of law on Plaintiffs' section 1983 claim. Accordingly, insofar the BSO's Motion for Summary Judgment is granted with respect to Count X.

### 6. Count XI against Wilkin, Goodwein, Barcelo, Brooks, and Reffett: Conspiracy Under Section 1983

In Count XI Plaintiffs seek to recover from Wilkin, Goodwein, Barcelo, Brooks, and Reffett under section 1983 based on a conspiracy to unlawfully seize Plaintiffs in violation of their Fourth Amendment rights. "[T]o sustain a conspiracy action under § 1983 . . . a plaintiff must show an underlying actual denial of [his] constitutional rights. In addition, the plaintiff must prove that the defendants reached an understanding to deny the plaintiff's rights." *Hadley v. Gutierrez*, 526 F.3d 1324, 1332 (11th Cir. 2008) (internal quotation and citations omitted).

Here, Plaintiffs claim that all five Defendants entered into an agreement to "fabricate a story to justify their blatantly unconstitutional arrests of Plaintiffs." SAC ¶ 179. According to Plaintiffs, Brooks and Reffett made a conscious decision to arrest Plaintiffs without probable cause. *Id.* ¶ 179(a). Further, Plaintiffs claim, Wilkin, Goodwein, and Barcelo knew there was no probable cause to arrest Plaintiffs but did so anyway, and then agreed to sign and swear to false allegations of criminal activity with the "consent and affirmation of Brooks and Reffett. *Id.* ¶ 179(b)-(c).

As the Eleventh Circuit has stated, "the linchpin for conspiracy is agreement, which presupposes communication." *Bailey v. Bd. of County Comm'rs of Alachua County, Fla.*, 956 F.2d 1112, 1122 (11th Cir. 1992). Here, there is no evidence to suggest that all five BSO Defendants communicated and agreed among each other to arrest Plaintiffs without probable cause. The arresting deputies testified that they believed they were instructed to arrest all individuals on the railroad tracks. Wilkin Depo. at 62; Goodwein 2008 Depo. at 48; Barcelo Depo. at 51; Pulitano Depo. at 35. Brooks testified that he believed he ordered Reffett to deal with the individuals on the tracks – arresting those who were committing crimes, dispersing those who were not – before he continued marching north up First Avenue. Brooks Depo. at 71-72. Reffett testified that he did not order the arrest team to make arrests on the tracks and did not know why the arrest team had been

---

[17] In addition, the record is replete with evidence that the BSO did conduct extensive training exercises in preparation for the FTAA summit. *See, e.g.*, Brooks Depo. at 23, 26, 40-44; Crane Depo. at 30, 36-37, 47-48; Wilkin Depo. at 27-28.

called, and that he believed he was instructed to move those on the tracks out of the area.  Reffett Depo. at 44-45, 47, 82.  The Court cannot find any evidence in the record, nor do Plaintiffs point to any, suggesting that Brooks and Reffett "consented to" and "affirmed" the allegations of criminal activity in Plaintiffs' arrest affidavits, or that the arresting deputies agreed among themselves to make those allegations.  *See, e.g.*, Reffett Depo. at 74-75 (stating he never inquired into or became aware of the basis for Plaintiffs' arrests); Brooks Depo. at 78-79 (same).

In sum, it appears from the record that Plaintiffs' arrest resulted more from a *lack* of communication and a misunderstanding, rather than actual communication and an understanding to deny their constitutional rights.  As such, the individual BSO Defendants are entitled to judgment as a matter of law on Plaintiffs' conspiracy claims and their Motion for Summary Judgment is granted as to Count XI.

## B.   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs have moved for summary judgment on Counts I-IV against Wilkin, Goodwein, and Barcelo, Count V against Brooks and Reffett based on supervisory liability, and Count IX against the BSO for false arrest.  The Court's prior determinations with respect to those claims dictate the outcome of Plaintiffs' Motion.  Specifically, because the Court has found a genuine issue of fact regarding the existence of probable cause to arrest Plaintiffs, regarding whether they were arrested in retaliation for exercising their free speech rights, and regarding Brooks' and Reffett's respective roles in bringing about their arrests, Plaintiffs are not entitled to judgment as a matter of law on Counts I-V and IX.  Thus, Plaintiffs' Motion for Summary Judgment is denied in its entirety.

## C.   THE CITY'S MOTION FOR SUMMARY JUDGMENT

In its Motion for Summary Judgment the City seeks judgment as a matter of law on Counts XII and XIII of the SAC.  In Count XII Plaintiffs sue the City under section 1983 for failure to train, supervise and control.  *See* SAC ¶¶ 183-89.  In Count XIII Plaintiffs sue the City under section 1983 for having a "policy to suppress speech."  *See id.* ¶¶ 190-93.  The Court considers each claim in turn.

### 1.   Count XII: Failure to Train

As stated above, a municipality such as the City cannot be held liable under section 1983 for the acts of its employees under a theory of *respondeat superior*.  *See Bd. of County Comm'rs v. Brown*, 520 U.S. at 403.  "[M]unicipal liability under § 1983 attaches where – and only where – a *deliberate choice* to follow a course of action is made from among various alternatives by the official

or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483 (emphasis added). "Only those officials who have final policymaking authority may render the municipality liable under § 1983." *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005) (internal quotation and citations omitted).

As explained above with respect to the BSO, a municipality can be held liable for "failure to train" under section 1983 if it had an official policy of inadequately training or supervising its officers and that policy caused the officers to violate Plaintiffs' constitutional rights. *Canton*, 489 U.S. at 389-91. "Since a municipality rarely will have an express written or oral policy of inadequately training or supervising its employees, the Supreme Court has further explained that a plaintiff may prove a city policy by showing that the municipality's failure to train evidenced a 'deliberate indifference' to the rights of its inhabitants." *Gold*, 151 F.3d at 1350.

Here, Plaintiffs claim that the City "failed to ensure that [its police officers or agents under its control]: a) made no arrest without probable cause, and b) respected the free speech and assembly rights of persons on the streets of Miami." SAC ¶ 85. However, in order to establish the "deliberate indifference" required to hold a municipality liable under section 1983, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold*, 151 F.3d at 1350 (citing *Board of County Comm'rs v. Brown*, 520 U.S. 397). "[W]ithout notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise." *Id.* at 1351.

In support of their argument that the City was on notice of a need to train or supervise in the areas of arresting with probable cause and not violating free speech rights, Plaintiffs point to the "Elian Gonzales" protests. According to Plaintiffs, in January and March of 2000 several thousand people demonstrated in the streets of Miami to protest the United States government's decision to send a boy named Elian Gonzales, then living in Miami, back to live with his father in Cuba. Ad Hoc Report, D.E. #160-11 at 1; Plaintiffs' Resp., D.E. #156 at 20. Plaintiffs point to a Report generated by the Ad Hoc Committee To Investigate Police Community Relations, formed by the City of Miami, which investigated claims of police misconduct and tactics during those protests and ended up criticizing the MPD in various areas. Plaintiffs claim that the Report provides evidentiary support for their argument that the City knew its officers were not properly trained on arrest issues

related to political demonstrations.  The City contends that the Elian Gonzales protests were not sufficiently similar to the FTAA summit protests to provide the required notice of a need to train or supervise.

However, even assuming that the Elian Gonzales protests provided the City with the required notice of a need to train or supervise,[18] Plaintiffs' failure to train claim against the City cannot survive the City's Motion for Summary Judgment.  In order to establish their failure to train claim Plaintiffs must provide some evidence that the City knew of a need to train or supervise in a particular area "*made a deliberate choice not to take any action*." *Gold*, 151 F.3d at 1350 (emphasis added).  Here, there is no evidence that City, through its official policymakers, made a "deliberate choice" not to take any action on police training.  The evidence that Plaintiffs submit as support for their claim cuts the other way – the fact that Miami City Commission formed a committee to analyze police conduct during the Elian Gonzales protests and generate a report with recommendations demonstrates that the City made a choice to *take action* on issues raised as a result of those events. The Report itself states that "the Ad Hoc Committee To Investigate Police Community Relations[] was formed pursuant to a resolution adopted by the Miami City Commission" and "was charged with the responsibility of investigating and reviewing the interaction between the Miami Police Department and members of the public" who gathered at the Elian Gonzales protests.   Ad Hoc Report at 1.  The Committee held open meetings and heard testimony from members of the public, and reviewed hundreds of pages of documents from the MPD.  *Id.*  Further, the Committee made numerous detailed recommendations regarding planning, use of crowd control tools and methods, police training, and respecting lawful civil disobedience by members of the public.  *Id.* at 6-10. Plaintiffs themselves state that the City was "sued for civil rights violations in numerous cases involving false arrest and/or excessive force" stemming from the Elian Gonzales protests, and that "*[i]n response*, the City of Miami Commission established the [Ad Hoc Committee] to determine what had occurred during the Elian demonstrations and to make recommendations for reform." Plaintiffs' Resp., D.E. #156 at 20.  While Plaintiffs point out that the City's Police Chief and Deputy

---

[18]  It is questionable whether it can fairly be said that the Elian Gonzales protests could have provided the City with such notice.  Those protests were far smaller, did not involve the coordination of over 40 law enforcement agencies in the largest joint law enforcement effort in Florida's history, and did not appear to involve the same degree of violence from some of the protestors.

Police Chief did not read the Report in preparation for the FTAA summit, this argument misses the key issue for purposes of section 1983 municipal liability: whether the City itself, through its final policymakers, knew that its police officers needed training in making arrests with probable cause and without violating citizens' First Amendment rights and made a deliberate choice not to take any action. Plaintiffs' own evidence, in the form of the Ad Hoc Report that the Miami City Commission itself brought about, belies this argument.[19]

Also, for section 1983 liability to attach to the City "the identified deficiency in [the] city's training program must be closely related to the ultimate injury." *Canton*, 489 U.S. at 391. Plaintiffs do not adequately explain, with support from the record, how any deficiency in the City's training of its police officers was "closely related" to their alleged constitutional rights violations. For these reasons the City is entitled to judgment as a matter of law on Plaintiffs' failure to train claim, and its Motion for Summary Judgment is granted as to Count XII.

### 2.      Count XIII: Policy to Suppress Speech

In Count XIII Plaintiffs seek to recover under section 1983 against the City based on their argument that City had a policy of suppressing free speech, which led to their arrests without probable cause and in violation of their First Amendment rights.

Again, "municipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483. "Only those officials who have final policymaking authority may render the municipality liable under § 1983." *Cooper*, 403 F.3d at 1221. Only where "deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights" does section 1983 municipal liability attach. *Board of County Comm'rs v. Brown*, 520 U.S. at 400.

Here, Plaintiffs have failed to adduce evidence showing that a final policymaker for the County adopted an official policy of suppressing free speech rights. "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be

---

[19] In addition, the record is replete with evidence that the City *did* conduct extensive training exercises in preparation for the FTAA summit. *See, e.g.*, Fernandez Aff.; Colombo Depo. at 21-27; Brooks Aff. at 1-2; Brooks Depo. at 23, 40-44.

said to be acting on behalf of the municipality." *Sewell*, 117 F.3d at 489.  In support of their "policy" claim against the City, Plaintiffs refer the Court to a PowerPoint presentation apparently shown to law enforcement officials in connection with the City's FTAA preparation training.  PowerPoint, D.E. #160-4; 160-5; 160-6; 160-7.  However, it is unclear from the record who generated this presentation – Fernandez testified in his deposition that a supervisor within Miami Police Department created it, but did not identify who.  Fernandez Depo. at 46.  The PowerPoint slides also do not suggest that the City had a "policy" of suppressing free speech – the slides refer to the majority of political protestors as being peaceful, articulates one of the goals of the security effort as protecting the protestors' civil liberties, and discusses how to deal with potentially violent protestors.  Moreover, it is not at all clear from the PowerPoint or Plaintiffs' Response how that presentation could be causally connected to Plaintiffs' alleged constitutional rights violations such that it was the "moving force" behind them.  *Board of County Comm'rs v. Brown*, 520 U.S. at 400.

Plaintiffs also offer police action logs from the City's Police Department the Miami-Dade County Police Department which they claim "strongly suggest that the police action taken on the railroad tracks was the result of a calculated plan by the MPD to 'box in' and arrest whoever was found and trapped therein."  Plaintiffs' Resp., D.E. #156 at 14; Logs at D.E. #160-8; 160-9.  However, these documents offer no support for Plaintiffs' theory that the City had an *official policy* of suppressing free speech, adopted by a final decision-maker for the City; there is no indication on these logs as to who issued such orders to "box in" protestors, or why.[20]

_____

[20]  Plaintiffs also argue that Fernandez "was the delegated policy/decision maker for the FTAA," essentially arguing that his actions on November 20, 2003 can constitute City policy. Plaintiffs' Resp., D.E. #156 at 7.  Plaintiffs are essentially making an impermissible *respondeat superior* claim here.  Plaintiffs fail to adequately explain how Fernandez was delegated the authority to make "policy" for the City, how his alleged actions constituted a City "policy," and what that "policy" was.  Merely because Fernandez was assigned to serve as the City's operations commander at the FTAA summit (*see* Fernandez Depo. at 5-7) does not mean he was authorized to make final policy for the City in an area such as free speech.  Indeed, "the mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority. Rather, the delegation must be such that the subordinate's discretionary decisions are not constrained by official policies and are not subject to review."  *Mandel v. Doe*, 888 F.2d 783, 792 (11th Cir. 1989) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125-28 (1988)).  Fernandez himself agreed that he was operations commander for the MPD's security effort at the summit, but that he was "subject" to the "command and direction" of the MPD Chief of Police, and that the Chief was the "ultimate authority."  Fernandez Depo. at 6-7.

In sum, there is nothing in the record to suggest that the City had an official policy, promulgated by a final decision-maker, of suppressing citizens' free speech rights. Thus, the City is entitled to judgment as a matter of law on that claim as well, and its Motion for Summary Judgment is granted as to Count XIII.

## CONCLUSION

For the reasons stated above, it is hereby ORDERED as follows:

1) The Broward Sheriff's Office Defendants' Motion for Summary Judgment (D.E. #143) is GRANTED IN PART. Insofar as the Motion seeks judgment as a matter of law on Counts I-IV (section 1983 false arrest and First Amendment retaliation), Count V (supervisory liability), Counts VI-VII (section 1983 excessive force), and Counts VIII-IX (state law battery and false arrest), the Motion is DENIED. Insofar as the Motion seeks judgment as a matter of law on Counts X (section 1983 municipal liability) and Count XI (section 1983 conspiracy), the Motion is GRANTED;

2) Plaintiffs' Motion for Partial Summary Judgment (D.E. #147) on Counts I-IV (section 1983 false arrest and First Amendment retaliation), Count V (supervisory liability) and Count IX (state law false arrest) is DENIED in its entirety; and

3) The City of Miami's Motion for Summary Judgment (D.E. #138) on Counts XII-XIII (section 1983 municipal liability) is GRANTED in its entirety.

DONE AND ORDERED in Chambers, Miami, Florida, this August 11, 2008.

_____
Paul C. Huck
United States District Judge

Copies furnished to:
Counsel of Record

---

In any case, there is no evidence to suggest that Fernandez played a causal role in Plaintiffs' arrests. Fernandez testified although he did lead the BSO Field Force in marching north up First Avenue just prior to Plaintiffs' arrests, he did not witness those arrests because he kept marching after a contingent of the Force was diverted onto the tracks. *Id.* at 85-88. It also appears from the record that either Brooks or Reffett issued a call to the arrest team, not Fernandez.

34